A. G. B. MARTIN ET AL. v. P. A. TILLMAN ET AL.

1. FRAUDULENT CONVEYANCE. *Good between parties. Statute of frauds.*

Where a debtor, as the principal actor in a scheme to hinder and delay · creditors, procures his land to be fraudulently sold under execution, thereby vesting title in his wife, under the statute of frauds, neither he nor his heirs or representatives can question her title thus acquired.

2. ASSUMPSIT. *Purchase-money of land. Liability therefor.*

Where, after the death of his wife, a husband sells land of which she died seized, her heirs joining in the conveyance, with the agreement that they are to receive the purchase-money, which, however, he appropriates, he is answerable to them for the same, regardless of any express promise to pay.

3. SAME. *Tenant by curtesy. Rents. Money had and received.*

In such case, although the husband was then (1876) entitled to possession of the land as tenant by the curtesy, it is error to deduct from the amount due the heirs any thing on account of rents, they having signed the deed upon the promise of their father to pay them the amount received as purchase-money.

4. SAME. *Accounting. Money had and received.*

It is likewise error, in such case, to deduct from the amount of purchase-money received for the heirs the value of part of the land embraced in the deed made by them, which part had been previously conveyed away by their father and mother, and as to which it is claimed the heirs had no title. They are entitled to the amount received for them, without regard to the title to such portion of the land.

FROM the chancery court of Copiah county.

HON. H. C. CONN, Chancellor.

B. F. Martin, with his wife, E. J. Martin, resided in Copiah county, Mississippi. Prior to 1866, he was the owner of a tract of land in Sunflower county. He became financially involved, and Wesson & Drane recovered a judgment against him, which was transferred to one Barry. On January 8, 1866, the land in Sunflower county was sold under this as-

signed judgment, E. J. Martin becoming the purchaser and receiving a deed, which was placed on record. On February 18, 1876, E. J. Martin died intestate, leaving her husband surviving, also certain children, parties to this suit. After the death of his wife, it seems that B. F. Martin made several efforts to sell the Sunflower land, and finally did sell it March 4, 1890, to J. M. Goff for $4,400. Goff being unwilling to accept the deed from B. F. Martin alone, a quitclaim deed was obtained from appellees, the children and heirs of Mrs. Martin. The purchase-money was received by B. F. Martin, and there is evidence going to show that he agreed to pay it over to the children of E. J. Martin as an inducement for the execution of the quitclaim deed. On June 21, 1891, B. F. Martin died, leaving a will, which was executed February 19, 1891. In this will he appointed appellants, A. G. B. Martin and R. N. A. Martin, his sons, executors. He left no debts, unless, by reason of the facts above stated, he was indebted to his children. By his will he directed, first, the payment of all his debts, and he gave specific legacies to all his children, among whom were appellees, Mrs. Tillman, Mrs. Redus and Mrs. Mullins. He gave the *residuum* of his estate to the executors.

After the death of B. F. Martin, the appellees, Mrs. Tillman, Mrs. Redus and Mrs. Mullins, for the first time, made demand on the executors for their respective portions of the purchase-money of the Sunflower land received by B. F. Martin. Payment was refused, and they instituted actions at law against the executors for said amounts. Thereupon, the executors filed the bill in this case against said parties to prevent a multiplicity of suits, and obtained an injunction against the prosecution of the actions at law. The defendants moved to dissolve the injunction, and, the motion being overruled, they answered, making their answer a cross-bill, seeking to recover of the estate the respective amounts claimed by them on account of the purchase-money of said land, which, it was alleged, their father had received and ap-

propriated. In answer to the cross-bill, the executors set up that in 1866, when the Sunflower county land was sold, B. F. Martin was insolvent, and that, with a view to hinder and delay creditors, he and his wife, E. J. Martin, conceived a scheme by which, in fraud of creditors, the land was to be transferred to the wife; that B. F. Martin furnished Barry with money sufficient to pay the Wesson & Drane judgment, and that Barry paid the same, taking a pretended assignment of the satisfied judgment under which the land was sold, Mrs. Martin becoming the purchaser. They averred that Mrs. Martin paid nothing, and that she participated in the scheme to defraud creditors. It seems that in 1873, B. F. Martin and wife, through their attorney in fact, conveyed a portion of the Sunflower land to other parties. Testimony was taken at considerable length, and a decree was rendered in the court below in favor of the appellees; but, by the decree, there was deducted from the amount of the purchase-money of the land received for them the sum of $844, the value of that portion of the land which had been sold by B. F. Martin and wife through their attorney in fact, and there was also deducted the further sum of $250 on account of the rent of the remainder of the land from the time of the sale to Goff until the death of B. F. Martin, he being entitled to possession as tenant by the curtesy. As this court finds from the record that the title to the land was vested in E. J. Martin under the fraudulent scheme in which the said B. F. Martin was the principal actor, and that neither he nor his representatives can be heard to assail the title of his wife thus acquired, it is unnecessary to set out the evidence.

The defendants prosecuted a cross-appeal from so much of the decree as deducted from the amount due them the sum of $844, the value of that portion of the land sold in 1873, and $250, the agreed rent of the land sold to Goff from the date of the conveyance to him until the death of B. F. Martin.

A number of points were raised and discussed that are not·

passed upon. This statement, together with the facts set out in the opinion, will indicate the questions decided by the court.

*R. N. Miller* and *George S. Dodds*, for appellants.

As the judgment under which the land was sold had been paid, the sale was void, and Mrs. Martin acquired no title. Freeman on Judgments, §§ 466, 480; Rorer on Judicial Sales, §§ 720, 722, 728; 1 Hill (S. C.), 415; 37 Mo., 568; 17 Ind., 36; 19 *Ib.*, 432; 103 *Ib.*, 1; 110 *Ib.*, 211; 53 Am. R., 474; 19 Am. Dec., 411; 20 *Ib.*, 337; 27 *Ib.*, 578; 56 *Ib.*, 236; 3 Dana, 96; 21 Ala., 56; 20 N. Y., 395; 74 *Ib.*, 228; 10 S. E. Rep., 93. See, especially, *Shaw* v. *Clark*, 6 Vt., 507.

The statute of frauds, § 4226, code 1892, has no application, because, in the first place, the judgment of Wesson & Drane was not a fraudulent one. It was valid. The statute, by the use of the word "execution," means a fraudulent execution — one condemned by the statute. See 1 Smith's Leading Cases, 82 *et seq.*; Herman on Executions, § 274.

In this case there was no fraudulent execution and no fraudulent judgment, but an execution utterly void because the judgment had been paid. Besides, appellants are not insisting upon or attempting to enforce the judgment or execution.

It is not true that B. F. Martin and his representatives are estopped because he stood by and saw the land sold under the satisfied judgment. Estoppels at execution sales, by conduct or *in pais*, can only be invoked by *bona fide* purchasers. Rorer on Judicial Sales, § 443; Herman on Estoppel, § 422; 12 Am. Dec., 225. Mrs. Martin was not a purchaser for value, but had full notice.

Council cites *Claughton* v. *Claughton*, *ante*, 384, and insists that the case stands as though B. F. Martin had made a fraudulent deed to E. J. Martin, but that authority does not apply. B. F. Martin made no fraudulent grant, and there is a distinction as wide as the poles between estoppels by grant and estoppels *in pais* by conduct. In a case of a fraudulent

grant, the grantor is estopped, as against the grantee, on grounds of public policy, but B. F. Martin made no deed.   If he is estopped, it is by his conduct, and estoppels by conduct can only be invoked by those who are innocent, and have been misled.   Rorer on Judicial Sales, §§ 443, 728; Herman on Estoppel, ch. 15; 2 Smith's Leading Cases, 642 *et seq.;* 49 Miss., 576; 50 *Ib.*, 429; 55 *Ib.*, 261, 255, 671; 57 *Ib.*, 638; 61 *Ib.*, 299; 66 *Ib.*, 258.   B. F. Martin could never have been estopped by his conduct in favor of Mrs. Martin. She knew that the judgment was satisfied with Martin's money before the pretended sale.

We deny that Martin made appellees any promise to give them the money received from Goff; but, if he did, it was upon a wholly different consideration from that set out in their deed, and the promise was not in writing, and there was no consideration for it.   Walker (Miss.), 115; Reed on Statute of Frauds, §§ 683, 1071; 4 Mass., 347; 7 *Ib.*, 449, 483; 3 Pick., 83; 3 Am. Dec., 304; 5 *Ib.*, 62; 20 *Ib.*, 399; 8 Am. St. R., 304; 11 *Ib.*, 244.

The true ground upon which to place this case, in our opinion, is that Mrs. Martin never had a shadow of a claim to these lands, and that the efforts of appellees, her heirs, is simply to consummate an executory fraudulent contract.   In addition to the above authorities, we refer to 4 Pick., 314; 11 Wheat., 258; 4 Pet., 484; 15 Wend., 412; 1 Fairfield (Me.), 71.   For a collection of all the cases, see *Nellis* v. *Clark*, 20 Wend., 24, and 8 Am. & Eng. Enc. L., 771, note 4.

*J. S. Sexton,* for appellees.

I am not able to see how opposite counsel can avoid the force of the decision in *Claughton* v. *Claughton, ante,* 384, which seems to me to settle the principles of this case.   We insist, in the first place, that the money of B. F. Martin was not used in the purchase of the Wesson & Drane judgment. But, if mistaken in this, yet, if, by a fraudulent contrivance, B. F. Martin procured his land to be sold, and thereby fixed

title in his wife, he and his heirs and representatives are forever estopped to deny her title.    No one except *creditors* could assail it.

Counsel undertake to draw a distinction between B. F. Martin's attitude towards this property, which he induced the sheriff to sell, and what would have been his attitude in reference thereto if he had made the sale himself.    But there is no authority for this.    By § 4226, code 1892, gifts, grants and conveyances of land, as well as judgments and executions, had or obtained with the intent to hinder, delay and defraud creditors, are declared void as to creditors.    There is no difference between a fraudulent grant and a fraudulent sale of property under execution.    On this point, see Bump on Fraudulent Conveyances, 254, 256; 1 Smith's Leading Cases, 45; 57 Am. Dec., 668; 24 Miss., 144; 34 *Ib.*, 385; 43 *Ib.*, 641; 49 *Ib.*, 269; 50 *Ib.*, 380; 55 *Ib.*, 204; 68 *Ib.*, 323.    This is not at all in conflict with the authorities cited by opposite counsel on this subject.    By reference to these authorities, it will be seen that they refer to cases in which there was an effort to assert title by estoppel *in pais*, where the party sought to be estopped had simply stood silently by, without active interference to promote the sale.    Here B. F. Martin was the active agent in causing the sale, and is to be treated as if his own hand had moved the pen with which the deed was signed.    He comes directly within the rule laid down in Greenhood on Public Policy, page 57.

The evidence is abundant that appellees executed the deed upon the express promise that the money received for this land should be paid to them; and, furthermore, the will of B. F. Martin provides, first, for the payment of all his debts. As he owed no other debts, he must have had reference to this indebtedness due appellees.

There was no authority for deducting from the amount due appellees the value of that part of the land sold by the attorney in fact of Martin and wife.    B. F. Martin promised that if they would yield their title and execute a quitclaim of

all the lands, he would pay them the purchase-money received by him, and it makes no difference what was the condition of the title to that part of the land previously sold.

WOODS, J., delivered the opinion of the court.

It is undisputed that title to the Sunflower lands was vested in Mrs. E. J. Martin by virtue of a sale under a fraudulent execution issued at the instance of B. F. Martin as part of a deliberate scheme by him to hinder, delay and defraud his creditors. He was the author and the finisher of the fraudulent plan by which title to his lands was vested in his wife. He was the principal actor in the whole transaction, and not a mere silent looker-on while a sale was made by others under an invalid or void execution. His conduct brings him clearly within the terms of our statute of frauds, and neither he nor his heirs could be heard to assail the title of his wife or her heirs to the lands so fraudulently contrived by him to be vested in her. This view virtually disposes of the case. If the lands belonged to Mrs. Martin's heirs, as we hold they did, it needed no specific promises of B. F. Martin to pay over to them the funds arising from a sale of their lands. Without any promise, he was answerable for the money had and received in such sale.

The contention of the cross-appellees, both as to the deduction of the $844, the agreed value of the portion of the lands sold by Watts, attorney in fact, and as to the deduction of $250, rents of the lands from the date of sale to Goff until Martin's death, is well taken. These lands were all in possession of Martin as tenant by curtesy, and were all embraced in the deed to Goff and the quitclaim to Miller, and we find no intimation anywhere in the record that any distinction was made, or any agreement had, by which the purchase-money of only the lands outside of those sold by Watts, was to be accounted for by B. F. Martin. The appellees were induced to sign a quitclaim deed to all the lands therein embraced, on an express or implied undertaking of

their father to account to them for the proceeds .arising un-
der such sale.    Whether their title to the lands .once con-
veyed away by Watts was good or bad, no way concerned
the real controversy.    They quitclaimed all the lands, includ-
ing those once sold by Watts, for $4,400; and this was the
sum they were entitled to be paid by their father, who re-
ceived it.  · Of course, the father was entitled to the rents up
to the day of his death, but the amount of such rents should
not have been deducted from the $4,400.

B. F. Martin's estate was chargeable with interest at six
per cent. per annum on the sum received by him, after de-
ducting the several amounts paid Mrs. Martin's heirs imme-
diately after the sale to Goff and Miller, from the day of his
death, and no reference to rents in accounting should have
been made.    In all other respects, we concur with the learned
court below.

*Decree will be reversed in the particulars indicated, and decree
entered here for appellees and cross-appellants for one-eighth each
of $4,400, less the sums of $100 paid by B. F. Martin to Mrs.
Tillman and Mrs. Redus, and $50 paid Mrs. Mullins, respect-
ively, immediately after the sale to Goff, with interest at six per
cent. per annum on the amounts thus found to be due them sever-
ally from the day of B. F. Martin's death to date.*